453 S.E.2d 580 (1995)
L.C.S.
v.
S.A.S.
Record Nos. 0945-93-4, 2468-93-4, 0970-93-4 and 2469-93-4.
Court of Appeals of Virginia, Alexandria.
February 21, 1995.
*582 Joseph A. Condo (Beth A. Bittel, Joseph Condo & Associates, P.C., on briefs), for appellant/cross-appellee L.C.S.
Marcia M. Maddox (Law Office of Marcia M. Maddox, on briefs), for appellee/cross-appellant S.A.S.
Robert C. Dunn (Cohen, Dunn & Sinclair, on brief), guardian ad litem.
Present: MOON, C.J., FITZPATRICK, J., and DUFF, Senior Judge.
*581 FITZPATRICK, Judge.
In this domestic case involving cross-appeals, L.C.S. (wife) and S.A.S. (husband) assign twelve grounds of error with respect to the trial court's rulings on child support, spousal support, equitable distribution, access to a child's medical and psychiatric records, appointment of a guardian ad litem, and attorney's fees. For the reasons set forth below, we reverse and remand the child and spousal support issues, and affirm the trial court's judgment on all other issues.

BACKGROUND
The parties married December 30, 1971, and separated in March 1991. There were two children of the marriage, an emancipated daughter and an adopted son, born May 29, 1984. After a period of separation, on March 27, 1992, wife filed for divorce based on separation for more than one year pursuant to Code § 20-91(9)(a). On April 2, 1992, husband filed a cross-bill on the same ground. After six hearings, the trial court entered the final decree of divorce on November 10, 1993, and resolved all questions of equitable distribution, support, and fees.
Husband, an attorney, was the primary income producer for the family. After a brief period of active Army duty, husband began an eight-year government career that included several appointed positions. For the periods 1978 to 1981, 1983 to 1989, and 1990 to 1992, husband worked for three different private law firms in Washington, D.C. At one of the firms, husband earned $500,000 each year, and at another a base salary of $75,000, plus extra compensation for any work beyond 1000 billable hours. In March 1989, husband quit the legal profession to invest in a business venture known as Spectrum but returned to the practice of law in February 1990. Over the course of the marriage, husband contributed more than $3,000,000 to the marital estate. Husband often worked unusually long hours and traveled for business purposes.
Husband became very interested in young boys in his neighborhood and took these boys on camping trips and to ball games. Husband became a guardian to a young boy from the family's church, established a trust fund for him, and developed a relationship with the boy that lasted five to six years. What little free time husband had was devoted to these activities and other community interests rather than his own wife and children. The trial court found that husband's conduct was a negative nonmonetary contribution to the family's well-being: "He said he didn't have much time, but he spent much of the time he had with [the boys] instead of with his children and with his wife."
Wife has a bachelor's degree and worked full-time while husband finished law school. One month before the birth of their daughter in January 1975, she left full-time employment. Wife was the primary caretaker of the parties' children and was responsible for the daily running of the household. She was the parent who coordinated the children's care and school activities and actively participated in their education. Wife worked part-time as a church bookkeeper, managed an apartment building owned by the parties, and worked in a kitchen renovation business. Overall, wife's monetary contribution was about $40,000. Currently, wife works part-time as an office administrator for a real estate firm, with a salary of $20,000.
In March 1991, husband moved out of the marital bedroom. It was the intent of both parties to separate. At that time, a young boy from the family's church was living in the home. In September 1991, the boy alleged that husband had sexually abused him. *583 At wife's request, husband moved out of the marital residence in January 1992.
In 1992, husband was convicted of three felony sexual offenses with minor boys. At the first trial, husband was convicted and subsequently pled guilty to the other two indictments. The parties' son reported to a policeman and social worker that husband also had engaged in sexual acts with him. Part of husband's felony plea agreement was to have no contact with his son until the child became eighteen years of age. Husband was sentenced to serve ten years in the penitentiary and later lost his license to practice law as result of these convictions.
The parties stipulated that the marital estate for equitable distribution purposes was $1,027,758.40. After considering the factors required in Code § 20-107.3(E), the trial judge found that husband's substantial monetary contributions were balanced by the significant nonmonetary contributions made by wife. Additionally, the trial court determined that husband's activities outside the home with the young boys had a significant negative effect on the marriage. He then divided the marital estate equally.
As further relief, the trial court granted wife $23,942.48 in attorney's fees but denied wife's requests for child support, spousal support, and compensation for marital assets spent on husband's criminal defense. The trial judge also struck an earlier provision from the final divorce decree that gave husband access to his son's academic and medical records. To protect the child's interests on the access to records issue, the court appointed a guardian ad litem for him.

SPOUSAL SUPPORT
The trial judge considered the potential income from husband's half of the marital estate and determined that the amount was insufficient to serve as the basis for a support award. The trial judge denied wife's request for spousal support, based upon husband's incarceration and his inability to earn current income. However, he did give wife a reservation of spousal support.
The record clearly established wife's need for support, but in considering husband's ability to pay, the trial judge focused only on husband's lack of income while incarcerated and did not fully consider husband's financial resources.
"[T]he decision to award spousal support rests within the sound discretion of the trial court. However, such discretion is not absolute and is subject to review for abuse." Via v. Via, 14 Va.App. 868, 870, 419 S.E.2d 431, 433 (1992).
In awarding spousal support, the chancellor must consider the relative needs and abilities of the parties. He is guided by the nine factors that are set forth in Code § 20-107.1. When the chancellor has given due consideration to these factors, his determination will not be disturbed on appeal except for a clear abuse of discretion.
Collier v. Collier, 2 Va.App. 125, 129, 341 S.E.2d 827, 829 (1986).
Code § 20-107.1 governs spousal support and maintenance payments and expressly authorizes periodic or lump sum support. Once the requesting party establishes a need for and potential entitlement to spousal support, "then the court must weigh the relative needs and abilities of the parties in accordance with the statutory factors enumerated in Code § 20-107.1." Dukelow v. Dukelow, 2 Va.App. 21, 26, 341 S.E.2d 208, 210 (1986). Those factors include not only current income but also the financial resources of the parties. Code § 20-107.1(1). See Floyd v. Floyd, 17 Va.App. 222, 231, 436 S.E.2d 457, 462 (1993); Ray v. Ray, 4 Va.App. 509, 513, 358 S.E.2d 754, 756 (1987).
The primary basis for calculating a support obligation is a spouse's current income or any additional income within the spouse's earning capacity. To this should be added monies derived from income-producing assets or those assets that can be altered to produce income. Additionally, in an appropriate case, other financial resources that may currently fail to produce income may also be considered.
It is the legal and moral duty of a husband to support his wife and family consistent with his financial ability....
"In respect to alimony, the general rule is that the income of the husband, however *584 derived or derivable, is the fund from which the allowance is made." ...
The ability of the husband to pay is determined not necessarily by the amount of his actual earnings, but also by his ability to earn, and what, under all the circumstances [including his possessions], will be a fair and just allotment.
Taylor v. Taylor, 203 Va. 1, 3, 121 S.E.2d 753, 755 (1961) (emphasis added). See also Brauer v. Brauer, 215 Va. 62, 65, 205 S.E.2d 665, 667 (1974) (holding that financial resources include "any property from which [the husband] derives or could possibly derive some income").
Applying these rules to the facts in this case, we hold that the trial court erred in failing to consider the possibility of requiring husband to better use his $500,000 worth of financial resources to produce the income necessary to meet his support obligations. The trial judge considered only that husband's assets, if "invested conservatively," would produce $15,000 per year without examining any other alternatives. He then failed to factor even that limited amount into either a spousal or child support calculation.
We find under the facts of this case that the trial judge abused his discretion in failing to consider husband's financial resources, including the best use of his assets, in calculating his spousal support obligation.

CHILD SUPPORT
The trial judge refused to impute income to husband under Code § 20-108.1(B)(3) because he determined that husband's incarceration was not the equivalent of husband being "voluntarily unemployed."
The acts that have led to his inability to earn are voluntary acts on his part. But the fact that he is in prison and unable to earn is not voluntary on his part; he fought it tooth and nail.... I don't believe under those circumstances I can impute income to him.
The court applied the child support guidelines in Code § 20-108.2 and calculated that husband had no income. Even though the court determined that husband's assets had the potential to generate some income, as much as $15,000 per year, the court refused to deviate from the presumptive amount under Code § 20-108.1(B). However, as with spousal support, the court reserved wife's right to seek child support at a later time.
Wife argues that the trial court erred in: (1) finding husband's incarceration involuntary; (2) refusing to impute any income to husband when making the child support calculation; and (3) alternatively, failing to use husband's "financial resources" or assets as a basis for support. Wife contends that the trial court should have either considered husband's assets in determining husband's ability to pay child support or used husband's past salary as the basis for imputing income.
Husband argues that the trial court did not abuse its discretion in: (1) deciding that incarceration is not the equivalent of being "voluntarily unemployed"; (2) refusing to consider potential income from husband's share of the marital assets; and (3) determining that no deviation from the presumptive amount was appropriate. Husband contends that child support is solely income-based and that assets cannot be used to satisfy a child support obligation.
The guidelines in Code § 20-108.2 require a court to calculate the "`presumptive' amount of child support as a percentage of the parents' combined gross monthly incomes." Barnhill v. Brooks, 15 Va.App. 696, 699, 427 S.E.2d 209, 212 (1993). A rebuttable presumption exists that the amount resulting under the guidelines is the proper support amount. Id. "In setting an award of child support, the `primary issue before a trial judge is the welfare and best interests of the child, not the convenience or personal preference of a parent.'" Brody v. Brody, 16 Va.App. 647, 651, 432 S.E.2d 20, 22 (1993) (quoting Hur v. Department of Social Servs., 13 Va.App. 54, 60, 409 S.E.2d 454, 458 (1991)). If a court deviates from the presumptive amount, the court must make a written finding that application of the guidelines would be "unjust or inappropriate in a particular case." Code § 20-108.2(A).
A court must consider the factors in Code § 20-108.1(B) in deciding whether to deviate from the presumptive amount. These factors *585 include (1) the "[e]arning capacity, obligations and needs, and financial resources of each parent," Code § 20-108.1(B)(11) (emphasis added), and (2) "[i]mputed income to a party who is voluntarily unemployed or under employed." Code § 20-108.1(B)(3). In determining the ability of a spouse, and thus a parent, to pay support, a court must consider any assets owned by the spouse or parent and "actual earnings and his capacity to earn, whether from his personal exertions or his property." Robertson v. Robertson, 215 Va. 425, 427, 211 S.E.2d 41, 44 (1975). See also Taylor, 203 Va. at 3, 121 S.E.2d at 755.
We find that under Code § 20-108.1(B)(11), the "financial resources" of a parent, whether incarcerated or not, include the value of any assets and any potential income from those assets. To analyze this issue, a court must first determine the presumptive amount of support based upon the parents' income using the support guidelines. Code § 20-108.2. If the court finds that the obligor possesses assets that currently produce or must be liquidated and invested in order to produce income, the court should consider a deviation from the presumptive amount and determine how much asset income will be attributed to the parent in calculating his child support obligation.
It is undisputed that wife established a need for child support. As sole custodian of the parties' son, wife had a shortfall in her budget of approximately $5,000 per month. The child is afflicted with neurofibromatosis, a genetic disease of the nervous system that has both physical and mental effects. His disease and the alleged sexual abuse by his father require him to receive a variety of medical and psychological treatments. In addition to biweekly visits with his psychologist, the child has weekly visits with an allergist and an occupational therapist. Wife must not only pay the portion of these treatments uncovered by insurance, but must also arrange transportation to and from these appointments. The time needed for driving the child to his appointments adversely affects wife's ability to work full time.
We hold that, under the circumstances of this case, the trial court abused its discretion in failing to deviate from the presumptive amount of support based on husband's financial resources and the potential income from those resources. The court determined that, using a conservative calculation, husband's half of the marital estate could produce $15,000 per year in income. Where the need for support was established, the presumptive guideline support amount was zero, and a spouse had financial resources that could have been invested or liquidated to pay support, deviation from the guidelines was appropriate, if not required. If the trial court's ruling is allowed to stand, wife would be required to deplete her entire estate to support herself and her child, and, upon husband's exit from prison, he would walk out of prison with an intact equitable distribution award.
We agree with wife that the trial court erred in failing to consider husband's "financial resources" as required by Code § 20-108.1(B)(11), as well as his actual income. We do not decide whether an incarcerated parent is "voluntarily unemployed" under Code § 20-108.1(B)(3) due to his incarceration because here the known resources of the payor parent provide an alternate means of computing an award. Additionally, income imputation is inappropriate in this case because husband is legally barred from the practice of law due to the loss of his license. Thus, his former employment is a legal impossibility, and any imputation of income based on that employment would be speculative. Applying these principles to the instant case, we hold that the trial court abused its discretion in failing to adequately consider husband's financial resources in calculating child support.

WASTE OF MARITAL FUNDS
Wife argues that the court erred in failing to compensate her for husband's use of marital funds to pay for his criminal defense and other legal fees. We address only the propriety of the criminal defense expenditures because wife did not raise at trial the divorce and business legal fees. Rule 5A:18.
Husband withdrew $20,000 from a marital money market account to cover a portion of *586 his criminal defense fees. In addition, husband withdrew $5000 to pay his divorce attorneys and borrowed over $12,000 against a marital home equity line of credit to cover divorce and business legal fees. In finding that husband properly spent marital funds on attorney's fees for his criminal defense, the trial court stated: "[W]hether or not he succeeded [in his criminal case] did have an effect on the rights of the family and for him to spend that [money] was his attempt to try to maintain his freedom and ability to earn."
Wife argues that husband failed to meet his burden of proving that the funds were used for a "proper purpose" and that husband did not provide a full accounting of his use of the funds.
"Once the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Clements v. Clements, 10 Va.App. 580, 586, 397 S.E.2d 257, 261 (1990). An improper purpose is one that is "unrelated to the marriage and in derogation of the marital relationship at a time when the marriage is in jeopardy." Alphin v. Alphin, 15 Va.App. 395, 402, 424 S.E.2d 572, 576 (1992) (quoting Booth v. Booth, 7 Va.App. 22, 27, 371 S.E.2d 569, 572 (1988)). Previously, we approved the use of marital funds for living expenses and attorney's fees in divorce proceedings. Amburn v. Amburn, 13 Va.App. 661, 666, 414 S.E.2d 847, 850 (1992).
We find no abuse of discretion in the trial court's finding that husband's expenditure of marital funds for his criminal defense was for a proper purpose. If he had prevailed, it clearly would have been of benefit to his family as his incarceration would not have so limited his ability to support the family.

EQUITABLE DISTRIBUTION
When making an equitable distribution award, the trial court must consider all of the factors in Code § 20-107.3(E). The parties stipulated that the marital estate was worth $1,027,758.40. The estate included the marital residence with its adjoining unimproved lot, a Del Ray apartment building, husband's pension, several IRA accounts, a joint money market account, the cash value of several life insurance policies, and personal property. The trial judge divided the estate equally and balanced husband's significant monetary contributions against wife's nonmonetary contributions and the negative conduct of husband with young boys. "[Husband's] conduct was the primary cause of the dissolution of the marriage.... Monetary contribution is overwhelmingly in his favor; but matched against that is her contributions, non-monetary primarily, and his negative contributions by conduct."
Husband contends that the trial court abused its discretion in awarding a fifty-fifty split of the marital estate, particularly when his monetary contributions were so large, and in finding that husband's absences from home and his criminal convictions were the primary cause of the marriage's dissolution.
"[I]n reviewing an equitable distribution award, we rely heavily on the trial judge's discretion in weighing the particular circumstances of each case. Only under exceptional circumstances will we interfere with the exercise of the trial judge's discretion." Gamble v. Gamble, 14 Va.App. 558, 573, 421 S.E.2d 635, 644 (1992) (quoting Aster v. Gross, 7 Va.App. 1, 8, 371 S.E.2d 833, 837 (1988)).
Husband's argument is without merit. The trial judge thoroughly examined all of the evidence and considered the required factors in determining the equitable distribution award. His decision to balance equally each party's contributions to the marriage is clearly supported by the evidence. There is no requirement that monetary contributions be weighed more heavily than nonmonetary contributions. See Williams v. Williams, 4 Va.App. 19, 24, 354 S.E.2d 64, 6 (1987).

ATTORNEY'S FEES
Husband argues that the trial court erred when it awarded wife attorney's fees of $23,942.48 because he was incarcerated and had no income. The trial judge stated that wife could recover the fees "against [husband's] assets as her counsel deems appropriate." Husband's contention that attorney's fees must be paid using only current *587 income is unsupported by statute or case law. Thus, we affirm the judgment of the trial court.
"An award of attorney fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion." Graves v. Graves, 4 Va.App. 326, 333, 357 S.E.2d 554, 558 (1987). If a "wife needs and is entitled to maintenance and support and the husband has the financial ability to meet those needs," then the trial court should award attorney's fees to wife. Poliquin v. Poliquin, 12 Va.App. 676, 681, 406 S.E.2d 401, 405 (1991) (emphasis added) (quoting Thomas v. Thomas, 217 Va. 502, 505, 229 S.E.2d 887, 890 (1976)).
As the trial court recognized, "financial ability" encompasses not just income but also assets. In this case, wife could proceed against husband's half of the marital estate to satisfy her judgment for attorney's fees. Under these circumstances, we cannot say that the trial court abused its discretion in awarding attorney's fees to wife.

APPOINTMENT OF GUARDIAN AD LITEM AND HUSBAND'S ACCESS TO CHILD'S RECORDS
The trial court entered an initial final decree of divorce on April 12, 1993, that included the following provision:
Complainant shall immediately sign releases authorizing and directing all providers of any form of health care service, whether physical or mental, or educational services to the children of the marriage named above, to provide Defendant or his authorized representative copies of all records pertaining to such services, past, present and future, during the minority of such child, and to discuss with Defendant or authorized representative any and all aspects of any evaluation, testing, treatment, therapy or performance by such child. Complainant shall identify to Defendant or his authorized representative all providers of such services and shall take no action, directly or indirectly, to delay, impede or otherwise hinder Defendant's access to such information. This shall be a continuing requirement, and Complainant shall notify Defendant or his authorized representative of the name, address and telephone number of any such service provider, and shall execute a release for that provider at such time that services are first provided.
On April 26, 1993, wife filed a motion styled "Motion of A.J.T.S. by his Mother and Next Friend, L.C.S., to Modify the Final Decree of Divorce," in an attempt to delete the requirement to provide husband copies of their son's medical and school records. Her reason for requesting this relief was that disclosing information from the child's medical records would jeopardize the child's therapy for the alleged sexual abuse by husband. The trial judge stayed the final decree and set the motion for argument on June 15, 1993. At that hearing, he replaced wife as "next friend" and appointed an attorney to act as guardian ad litem for the child.
Husband argues that the trial court erred in: (1) hearing the motion after entry of the final decree because doing so allowed the child to "intervene in a divorce action," (2) appointing a guardian ad litem for the child nunc pro tunc, and (3) finding that good cause existed under Code § 20-107.2[1] to deny husband access to the requested records.
In addressing husband's arguments as to the appointment of the guardian ad litem, the trial judge stated:
This is not a child intervening in a divorce case. It's a child exercising its rights to be heard concerning the child's own future. And the child, I think, has the strongest interests of all....
[C]ounsel has appeared here representing [wife] as the next friend. And that may be perfectly fine, as far as a conduit for representation. If not, I hereby appoint him guardian ad litem for this child, nunc pro tunc to when he made his first entry into this case. So that the child's interests are *588 preserved and they may be heard fully by this Court.
We approved the "long established practice of appointing a guardian ad litem to protect the best interests of a child upon the chancellor's determination that such appointment is necessary." Verrocchio v. Verrocchio, 16 Va.App. 314, 319, 429 S.E.2d 482, 485 (1993) (upholding the appointment of a guardian ad litem in the context of a contested custody hearing). The appointment of a guardian ad litem is not necessary in every case but only in those in which the court makes a factual determination that it would be necessary to protect the interests of the child.
"The purpose of a nunc pro tunc order is to correct a clerical error or mistake and may not be used to create that which did not occur." Huger v. Huger, 16 Va.App. 785, 789, 433 S.E.2d 255, 258 (1993). Although it may have been error for the trial judge to enter the guardian ad litem appointment nunc pro tunc, it was harmless as the trial court had continuing jurisdiction to resolve this issue.
The appointment of the guardian ad litem is related to the issue of husband's access to the medical and psychological records of the child. Although wife endorsed the original decree, at the motion hearing, she testified that she did not know the extent of the records provision and thought the provision was to apply only to records in her possession before the decree. The court stated:
[P]aragraph nine was improvidently included in the Final Decree.... [I]t's not in the child's best interests that his records be disclosed to his father. The child believes he was sexually abused and hurt by his father.... What's he going to do with [the information]? He can't contact the child. He can have nothing to do with the child.
In finding "good cause" under former Code § 20-107.2, the court considered the testimony of the child's therapist that to disclose the records would be a breach of trust and harmful to the child, and husband's agreement to have "no contact" with his son until the child became eighteen.
"The trial court's decision, when based upon an ore tenus hearing, is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it." Venable v. Venable, 2 Va.App. 178, 186, 342 S.E.2d 646, 651 (1986). "Certainly it is true that the legal rights of the parent should be respected in custody proceedings, ... but the welfare of the child is to be regarded more highly than the technical legal rights of the parent." Forbes v. Haney, 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963). By placing the record access provision in the support and custody statute, the legislature made the right of a parent to access a child's records an adjunct to custody and visitation.
Just as a child's best interests may require additional protection in a contested custody case, so may the decision to allow access to a child's medical, psychiatric, and school records. Clearly, in most cases both parents should have access to their child's records. This was the intent of former Code § 20-107.2. However, there may be circumstances which dictate a limitation on dissemination.
The record in this case is replete with evidence of "good cause." The child believed "he was sexually abused and hurt by his father," and was mortally frightened that his father might escape from prison and harm him. His therapist testified that disclosure of the child's psychological records would adversely affect his recovery because she would feel compelled to tell him of the required disclosure. We affirm the trial court's appointment of the guardian ad litem to protect the child's interests and the decision to deny husband access to any records concerning the child.

HUSBAND'S CRIMINAL RECORD
At the June 15 hearing concerning husband's access to the child's medical, psychological, and academic records, the trial court admitted into evidence sua sponte husband's guilty plea containing the "no contact" provision and the order from husband's criminal case. Husband argues that the trial court erred in admitting the criminal order *589 and his guilty plea because a court cannot take judicial notice of its own records.
Assuming error, the admission of the criminal order was harmless because no additional prejudice to husband resulted. "[E]rror which does not injuriously affect the interest of the party complaining is not reversible." Jenkins v. Winchester Dep't of Social Servs., 12 Va.App. 1178, 1186, 409 S.E.2d 16, 21 (1991). Both parties, their counsel, and the judge knew the details of husband's criminal convictions, which were referred to throughout the entire trial of the divorce case.
Husband's guilty plea is clearly a party admission. "Any statement by a party to the proceedings ... is admissible as an exception to the hearsay rule when offered against that party." Alatishe v. Commonwealth, 12 Va. App. 376, 378, 404 S.E.2d 81, 82 (1991). We affirm the trial court's rulings on the admissibility of the guilty plea and the criminal order.

TRANSPORTATION ORDER
As a result of husband's criminal convictions, he was sent to the Department of Corrections while the divorce case was pending. On January 14, 1993, Judge Swersky, a judge other than the trial judge, entered an agreed transportation order returning husband to the Alexandria jail where he was to remain "until further order of the Court." On May 5, 1993, Judge Swersky again entered a transportation order, this time sending husband back to the Department of Corrections. Husband moved to vacate this order because the trial court had stayed the finality of the divorce decree until it decided the issue of husband's access to the child's records. The request for a stay was denied May 6, 1993. At the hearing on June 15, 1993, the trial judge denied husband's counsel's request to continue the hearing until husband could be transported to the hearing.
Husband contends that the trial court erred in: (1) allowing a judge other than the presiding divorce judge to enter the transportation order, (2) permitting husband to be sent to the Department of Corrections while a divorce motion was still pending, and (3) denying husband's continuance request.
Husband's argument that allowing a judge other than the judge deciding the divorce issues to enter the transportation order is without merit. The same judge who entered the original agreed transportation order bringing husband to Alexandria for the trial of the divorce case entered the later May 5, 1993 order. Husband lodged no objection in having a judge other than the divorce case judge enter the original order, and this became the law of the case.
We find no error in the trial court's denial of husband's counsel's motion for a continuance until husband could be present. "The decision whether to grant a continuance is a matter within the sound discretion of the trial court. Abuse of discretion and prejudice to the complaining party are essential to reversal." Venable, 2 Va.App. at 181, 342 S.E.2d at 648. In denying the continuance request, the trial judge stated:
You would be asking this Court to order the Sheriff of the City of Alexandria to go to wherever he is, transport him here and transport him back, at tax payers' [sic] expense. [Husband] is not poor. And I am not going to order that this Sheriff go down there and pick him up, just so he can be heard on a motion in a civil case.
Lastly, Code § 8.01-410[2] gives a trial court wide latitude in determining whether to order the Department of Corrections to deliver a prisoner to be a witness in a civil matter. Husband's attorney argued that wife would be presenting evidence of husband's alleged sexual abuse of their son and that husband's presence was necessary to counter this evidence. In considering "the importance of the personal appearance of the witness," however, the trial court determined *590 that husband's presence was unnecessary because the issue of husband's abuse would not be decided. "I would be making no finding that he has [abused his son]. I would make the finding that there is evidence that he has. And, for that reason, the child is in treatment.... I'm not going to find that a man molested his child, based on some one-sided testimony." Husband's attorney was present and cross-examined the witnesses presented by wife. A review of the record indicates no abuse of discretion by the trial court.
For the reasons stated, we reverse and remand on the child and spousal support issues, and affirm on all other issues raised.
Affirmed in part, reversed in part, and remanded.
NOTES
[1] Former Code § 20-107.2 stated: "[N]either parent shall be denied access to the academic, medical, hospital or other health records of that parent's minor child unless otherwise ordered by the court for good cause shown."
[2] Code § 8.01-410 states: "[T]he court, on the application of such party or his attorney may, in his discretion and upon consideration of the importance of the personal appearance of the witness and the nature of the offense for which he is imprisoned, issue an order to the Director of the Department of Corrections to deliver such witness.... [A]ny party to a civil action in any circuit court in this Commonwealth may take the deposition of a convict or prisoner in the institution...." (emphasis added).